UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

                                     Criminal Case No. 22-20334
v.                                 Honorable Linda V. Parker

D-1 ABDULAWAHAB MUSLEH,

       Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS (ECF Nos. 35, 36)

Defendant Abdulawahab Musleh ("Defendant") has been charged in an eight-count indictment with: four (4) counts of Interference with Commerce by Robbery, in violation of the Hobbs Act, 18 U.S.C. § 1951(a); three (3) counts of Use and Brandishing of a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c); and one (1) count of Use and Discharge of a Firearm During and in Relation to a Crime of Violence, also in violation of 18 U.S.C. § 924(c).

The charges stem from a series of robberies at three gas stations and one grocery store, all located in Wayne County, Michigan. Defendant now moves to suppress the evidence obtained from his arrest and searches of his home and vehicle. The Court conducted an evidentiary hearing on December 11, 2023, which was continued to May 29, 2024. At the hearing, the Government presented

testimony from five police-witnesses.  The Court also heard testimony from

Defendant.  For the reasons set forth below, Defendant's motions are denied.

## Factual Background

On May 15, 2022, a Citgo gas station in Detroit was robbed.  (ECF No. 42 at

PageID. 626.) The robber brandished a firearm at the cashier and ordered him to

turn over the money from the register.  (*Id.*)  The robber left with approximately

$2,900.  (*Id.*)  The cashier stated that the robber was wearing blue gloves.  (*Id.*)

Moreover, surveillance video shows the robber wearing a blue face covering, a

black jacket, jeans, blue gloves, and a hat that reads "Detroit" in white lettering.

(*Id.* at PageID. 627.)

On June 3, 2022, a Marathon gas station in Dearborn was robbed.  (ECF No.

35-2 at PageID. 306.)  The robber brandished a firearm and told the cashier to give

him "everything," and also told a customer to "be still."  (*See id.*; *see also* ECF No.

42 at PageID. 627-28.)  The robber fled with approximately $1,300.  (ECF No. 42

at PageID. 628.)  Surveillance video shows the robber wearing a black jacket, blue

jeans, a blue face covering, a blue glove, white and dark colored "Jordan style"

shoes, and a hat that reads "Detroit" in white lettering.  (*Id.*; *see also* ECF No. 35-2

at PageID. 306.)  An eyewitness described the robber as "an Arab male,

approximately 20 years old, and approximately 5'10" tall with a thin build."  (ECF

No. 35-2 at PageID. 306.)  The witness further described the suspect as leaving in a

dark colored sedan with dark colored wheels and turn signals on the front fenders behind the wheel wells.  (*Id.*)

On June 11, 2022, a Sunoco gas station in Detroit was robbed.  (ECF No. 42 at PageID. 629.)  The robber brandished a firearm and demanded money from the cashier.  (*Id.*)  The robber collected the money and fled.  (*Id.*)  Surveillance video shows the robber wearing a black jacket, blue jeans, dark colored shoes, a scarf around his face, and a hat that reads "Detroit" in white lettering.  (*Id.* at PageID. 630-31.)

On June 15, 2022, the Al-Bushra Market in Dearborn was robbed.  (ECF No. 35-2 at PageID. 307.)  The robber brandished a firearm and demanded money from a customer.  (*Id.*)  The customer did not furnish any money to the robber.  (*Id.*) The robber then discharged his firearm into the ceiling and demanded money from the cashier while ordering the first customer to assist the cashier in emptying the register.  (*Id.*)  A second customer was forced to the ground at gunpoint.  (*Id.*) While exiting, the robber demanded money from a third customer, who gave the robber his wallet containing money, credit cards, bank cards, and driver's license. (*Id.*) Surveillance video shows the robber wearing blue jeans, a blue face covering and a hat that reads "Detroit" in white lettering.  (ECF No. 42 at PageID. 633.)  An eyewitness described the robber as "a [B]lack male, with a thin build."  (ECF No. 35-2 at PageID. 307 (alteration added).)

3

When police arrived at the Al-Bushra Market, they were able to recover a spent shell casing from a 9mm Luger.  (*Id.* at PageID. 309.)  Further, using a license plate reader ("LPR") system, officers were able to identify a BMW in the vicinity of the market at the time of the robbery.  (*Id.* at PageID. 307-08.)  Officers were also able to identify the same vehicle in the vicinity of the Marathon gas station at the time of its robbery. (*Id.* at PageID. 309.)  Officers conducted a Law Enforcement Information Check ("LEIN") of the address registered with the BMW and learned that Defendant was listed as an occupant of that address.  (*Id.*)  A criminal history check revealed that Defendant had a felony conviction stemming from Louisiana.  (*Id.* at PageID. 309-10.)

Lastly, police were able to identify a fingerprint from a plastic barrier that the robber touched.  (*Id.* at PageID. 309.)  After comparison to a print card from his prior conviction, it was determined that the fingerprint belonged to the left index finger of Defendant.  (*Id.*)

On June 16, 2022, officers from the Dearborn Police Department conducted surveillance of the address connected to Defendant and arrested him.  (*Id.* at PageID. 310.)  A search incident to arrest revealed a BMW key in his front pocket. (ECF No. 47 at PageID. 738.)  Upon questioning, Defendant directed officers to the BMW's location.  (ECF No. 42 at PageID. 641.) Officers located the BMW

4

parked illegally in an alleyway, and had it towed to their police station where it was stored until a search warrant was obtained.  (ECF No. 47 at PageID. 742.)

The following day, June 17, 2022, Defendant was interviewed by two officers in relation to the Al-Bushra Market robbery.  (ECF No. 43 at PageID. 679.)  One of the officers involved in the interview, Corporal Matthew Greb, was involved in Defendant's arrest the previous day.  (ECF No. 47 at PageID. 725-26.) Prior to the interview beginning, the officers stated that they were going to give Defendant his *Miranda* rights and identified them as the same rights he had been given at the time of his arrest.  (*Id.* at PageID. 815.)  Defendant read aloud, and signed, an Advice of Rights form, waived his *Miranda* rights, and answered the officers' questions. (ECF No. 47 at PageID. 678.)

During the interview, Defendant admitted to all four robberies.  (*Id.* at PageID. 679.)  In reliance on statements given by Defendant, a search warrant was obtained for the BMW and Defendant's home.  (ECF No. 47 at PageID. 822.)  The search of the BMW revealed a black coat, a blue face covering, blue latex gloves, white and dark colored shoes, and a hat that reads "Detroit" in white lettering. (ECF No. 43 at PageID. 670-71.)  A second hat that reads "Detroit" in white lettering was found inside the home, under his mattress.  (*Id.* at PageID. 670.)

Parties' Arguments

i.   Motion to Suppress Fingerprints (ECF No. 35)

Defendant argues that his arrest lacked probable cause.  Specifically, he argues that latent fingerprint analysis, that is the comparison between a "latent fingerprint" (an unidentified fingerprint that is found at a crime scene) and a "known fingerprint" (a fingerprint collected where the suspect's identity is known) suffers from serious issues with validity and consistency.  (*See* ECF No. 35 at PageID. 291-92.)  He argues that the current standard used by the Dearborn Police Department, ACE-V—standing for analysis, comparison, evaluation, and verification—is unreliable and, therefore, his identification based on this fingerprint analysis is unreliable.  (*Id.* at PageID. 295.)  He further argues that since the fingerprint analysis is unreliable, there is no basis for his arrest as no other evidence supported probable cause.  (*Id.*)

Moreover, Defendant argues that in September 2016, the President's Council of Advisors on Science and Technology ("PCAST") published their Report to the President – Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods ("PCAST Report"), which recommended the adoption of a new standard for fingerprint analysis.  (*Id.* at PageID. 292.)  This new standard, Defendant argues, is to reduce bias in the fingerprint analysis process and

6

make the analysis more reliable. (*Id.*) Defendant argues that the ACE-V method falls below the standard identified in the PCAST Report. (*Id.* at PageID. 293.)

Additionally, Defendant argues that information from the license plate of the vehicle used during the robbery connecting him to the crime does not give rise to probable cause. (*Id.* at PageID. 296.) He also argues that the eyewitnesses' descriptions of him are inconsistent. (*See id.* at PageID. 286 (alteration added) ("The eyewitness descriptions are bare, inconsistent and do not match Mr. Musleh—one identifies [the suspect as] a Black male, which he is not.").)

The Government, in opposition, argues that: (1) "probable cause" is not a high standard (*see* ECF No. 42 at PageID. 644-45); (2) absent the fingerprints, other factors contributed to probable cause leading to Defendant's arrest (*see id.* at PageID. 646-48); (3) PCAST's recommendations are not law (*see id.* at PageID. 648); (4) fingerprint analysis conducted pursuant to ACE-V is admissible at trial, where the standard of proof is "beyond a reasonable doubt," higher than "probable cause," (*see id.* at PageID. 649-50); and (5) differing descriptions of Defendant, being described as "Black," are eyewitnesses reporting what they believed to be his race, not his ethnicity. (*Id.* at PageID. 647.)

ii.   <u>Motion to Suppress Evidence of Non-Mirandized Statements (ECF No. 36.)</u>

Defendant argues that police relied on non-mirandized statements in support of the search of his vehicle and home. Specifically, he argues that: (1) during his

arrest, he was asked questions prior to receiving his *Miranda* warnings; (2) his response to these questions were illegally obtained by police and led them to the location of his vehicle; (3) his vehicle was searched twice, once without a warrant on the day of his arrest, and once after a warrant had been obtained; and (4) the affidavit supporting the warrant authorizing a search of his home did not establish a nexus between criminal activity and Defendant's home without the illegally obtained statements.  (*See* ECF No. 36.)  He argues that the fruits of these non-mirandized statements—evidence obtained from the search warrants—must be suppressed.

The Government, in opposition, argues that: (1) Defendant received his *Miranda* warning prior to being asked any questions on the day of his arrest, then received them again, the following day, at the police station; (2) Defendant voluntarily waived his *Miranda* rights and gave statements to the police in both instances; (3) Defendant's vehicle had only been searched pursuant to a search warrant but, there are several exceptions to the warrant requirement that apply; and (4) a search warrant for Defendant's home was only obtained after he was interviewed and waived his *Miranda* rights.  (*See* ECF No. 43 at 673-86.)

**Applicable Law & Analysis**

<u>PSCAT Report and Addendum</u>

As an initial matter, the Court agrees with the Government that the PCAST Report presents only advisory recommendations concerning the validity of the ACE-V method.  Other courts addressing the issue have held the same.  *See United States v. Bonds*, No. 15-CR-573-2, 2017 WL 4511061, at *3 (N.D. Ill. Oct. 10, 2017) (alterations added) ("[T]he PCAST Report presents only advisory recommendations concerning validity [of the ACE-V method].").

Moreover, while Defendant argues that the PCAST Report casts doubt on the ACE-V method, PCAST issued an Addendum to their September 2016 Report in January 2017 ("PCAST Addendum").[1]  Contrary to Defendant's argument that the PCAST Report finds latent fingerprint analysis unreliable, the PCAST Addendum concluded that "there was clear empirical evidence" that "latent fingerprint analysis . . . method[ology] met the threshold requirements of 'scientific validity' and 'reliability' under the Federal Rules of Evidence."  *See* PCAST Addendum at 2; *see also United States v. Pitts*, No. 16-CR-550, 2018 WL

---

[1] *See* President's Council of Advisors on Science and Technology (PCAST), *An Addendum to the PSCAT Report on Forensic Science in Criminal Courts* (2017) https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensics_addendum_finalv2.pdf (last visited July 1, 2024).

1116550, at *4-6 (E.D.N.Y. Feb. 26, 2018) (holding that the PCAST Addendum

undercuts defendant's argument that latent fingerprint analysis is unreliable).

As a result, the Court finds that PCAST recommendations are only advisory

and support the use of latent fingerprint analysis.  Further, the ACE-V method is a

permissible method of fingerprint analysis in this Circuit.  *See United States v.

Watkins*, 450 F. App'x 511, 516 (6th Cir. 2011) (approving of the ACE-V method

and holding that "even a less-than-perfect fingerprint-identification method can

still be scientifically valid").  The Court further finds that the use of these

fingerprints created probable cause for Defendant's arrest.

Probable Cause

Turning to probable cause, "a warrantless arrest by a law officer is

reasonable under the Fourth Amendment where there is probable cause to believe

that a criminal offense has been or is being committed."  *Devenpeck v. Alford*, 543

U.S. 146, 152 (2004).  "Probable cause necessary to justify an arrest is defined as

whether, at the moment of the arrest, the facts and circumstances within the

officers' knowledge, and of which they had reasonably trustworthy information,

were sufficient to warrant a prudent man in believing that the arrestee had

committed or was committing an offense."  *Wolfe v. Perry*, 412 F.3d 707, 716 (6th

Cir. 2005) (alterations omitted) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)); *see*

*also Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) (holding that

probable cause is determined by considering the "totality of the circumstances").

Here, officers were in possession of the following pieces of information

identifying Defendant as a suspect in the Al-Bushra Market robbery: (1)

Defendant's fingerprint at the scene of the robbery; (2) the license plate of the

suspect vehicle linked to an address associated with Defendant; and (3) two

descriptions of the robbery suspect that matched Defendant's description.  The

Court has already found that Defendant's fingerprint gives rise to probable cause.

i.   License Plate Reader (LPR) Information

Defendant argues that the information from the LPR linking him to the Al-

Bushra Market robbery does not amount to probable cause as: (1) he was never

seen in or near the vehicle; and (2) the vehicle is not registered to him but to

someone who shares an address with him.  (ECF No. 35 at PageID. 296.)  The

information provided by the LPR, standing alone, may not give rise to probable

cause.  However, looking at the totality of the circumstances, the LPR information,

combined with either the fingerprint identification or the eyewitness

identifications, would satisfy the probable cause requirement as each establishes an

independent basis for probable cause.  Therefore, even if the LPR information

alone did not give rise to probable cause, Defendant's arrest was not in violation of

the Fourth Amendment's probable cause requirement.

11

ii.   <u>Eyewitness Identifications</u>

Two eyewitnesses provided identifications of Defendant.  First, a witness from the June 3, 2022, Marathon gas station robbery in Dearborn identified the suspect as "an Arab male, approximately 20 years old, and approximately 5'10" tall with a thin build."  (ECF No. 35-2 at PageID. 306.)  Second, a witness from the June 15, 2022, Al-Bushra Market robbery in Dearborn identified the suspect as "a [B]lack male, with a thin build."  (*Id.* at PageID. 307 (alteration added).)  Officer Patrick Cecile was aware of both descriptions during the investigation of Defendant.  (*See* ECF No. 47 at PageID. 812 (alterations added) ("I was made aware of . . . two armed robberies in the City of Dearborn . . . [and] [t]he physical description of the suspect in both robberies.").)

Defendant argues that the witness from the Al-Bushra Market robbery gave an inaccurate description of him, describing him as "Black," where Defendant identifies as "Arab."  (*See* ECF No. 35 at PageID. 296 (alterations added) ("The eyewitness at Al-Bushra Market identified the suspect as [a] Black male—[Defendant] is an Arab male.").)  The Government argues that the description of the suspect as "Black" and not "Arab" was a description of the suspect's race, not his ethnic background.  (*See* ECF No. 42 at PageID. 647.)

"It is clearly established that an eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent

12

reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Brown v. Knapp*, 75 F.4th 638, 647-48 (6th Cir. 2023)) (alteration and quotation omitted).  There has been no assertion that the eyewitnesses were lying or were otherwise mistaken with respect to their recollections of events.  Defendant does not refute the description given by the witness of the Marathon gas station robbery, describing him as "Arab," thin, approximately 5'10" tall, and approximately 20 years old.

As it relates to the Al-Bushra Market robbery, he does not dispute being described as "thin" by the same witness who described him as "Black" instead of "Arab."  Moreover, the Court does not find that a witness describing a masked robbery suspect as "Black and thin" when the suspect identifies as "Arab and thin" to be a conflicting description.  As a result, even if one of the witnesses inaccurately described Defendant's ethnicity as "Black" instead of "Arab," the remaining portion of the description, as well as the Marathon gas station witness' identification, is sufficient to support a finding of probable cause.

Looking at the totality of circumstances, the police had probable cause to arrest Defendant as two of the three pieces of information, the fingerprint identification and the eyewitnesses' identifications, could both serve as independent bases for probable cause.

Defendant's *Miranda* Waiver

Turning to Defendant's *Miranda* wavier, "[s]tatements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been apprized of the constitutional right against self-incrimination and has validly waived this right." *United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003) (alteration added) (citing *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966)). "The government bears the burden of proving—by a preponderance of the evidence—the voluntariness of . . . an accused's *Miranda* waiver[.]" *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016) (alterations added) (citing *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986)).

At the hearing on December 11, 2023, the Court heard testimony on the issue of Defendant's *Miranda* waiver from Corporal Greb and Defendant. Corporal Greb testified credibly. While Defendant appeared to believe his version of events, his testimony was contradicted by the record.

   i.   Corporal Greb's Testimony

Corporal Greb testified that on the day of Defendant's arrest: (1) he was working as an undercover police officer and was not wearing a body camera (*see* ECF No. 47 at PageID. 732); (2) he arrested Defendant (*see id.* at PageID. 731); (3) Defendant was carrying a black iPhone at the time of his arrest (*see id.* at PageID. 736); (4) he advised Defendant of his *Miranda* rights (*see id.*); (5) he

14

recited the *Miranda* rights from memory, as opposed to reading them from a card or pre-printed form (*see id.* at PageID. 767); (6) he asked Defendant if he understood his *Miranda* rights, to which Defendant responded, yes (*see id.* at PageID. 740); (7) he searched Defendant incident to the arrest and found cash and a key to a BMW in Defendant's pocket (*see id.* at PageID. 737-38); (8) he asked Defendant for the passcode to his iPhone and the location of the BMW, both of which Defendant provided (*see id.*); (9) he provided the key fob to Corporal Steven Dluzynski (*see id.* at PageID. 739); and (10) he wrote a police report after the arrest which states that he provided Defendant his *Miranda* rights. (*See id.* at PageID. 739-40).

Corporal Greb, along with Officer Patrick Cecile, also participated in Defendant's recorded interview the following day.  At the beginning of the interview, Officer Cecile informed Defendant that they will go over his *Miranda* rights, the same rights he received the previous day, which Defendant responded by nodding affirmatively.  (*Id.* at PageID. 815.)

ii.  <u>Defendant's Testimony</u>

During Defendant's testimony, he acknowledged that during his interview he did not dispute Officer Cecile's assertion that he had been provided his *Miranda* rights the previous day.  (*Id.* at PageID. 848.)  However, Defendant testified that while he was given his *Miranda* rights the day of his arrest, they were not given by

Corporal Greb, but were given by a "Black officer." (*Id.* at PageID. 849.)

Specifically, Defendant testified to the following:

> Q: [D]id [O]fficer Greb . . . read you your *Miranda* rights?
> A: No, sir. I was read my *Miranda* [r]ights on that spot by a Dearborn officer. He was a Black officer.
> Q: He was a Black officer?
> A: Yeah, before he put me in the cruiser, he read me my *Miranda* [r]ights.
> . . .
> Q: Okay. So a Black officer, prior to transporting you, advised you of your *Miranda* [r]ights?
> A: Yes, sir.
> Q: But the officers asking you about the key fob and your pass codes, they did not advise you of your *Miranda* [r]ights?
> A: No, sir.

(*Id.* at PageID. 847 (alterations added).)  After this testimony, the Court

entered an order continuing the hearing to allow the Government to present the

officer that Defendant identified as transporting him after his arrest.  (*See* ECF No.

52.)

iii.   <u>Officer Cobbs' Testimony</u>

The Court resumed the hearing on May 11, 2024.  The only witness was

Officer Jordan Cobbs who transported Defendant after his arrest.  Officer Cobbs

testified credibly, his testimony was consistent with other evidence presented and

by video captured from his body-worn camera.  He testified that at the time of

Defendant's arrest, he was new to the police department and was still in training.

He further testified that he was in a marked patrol vehicle with his partner,

16

Corporal Gafford, when they were requested to transport Defendant from the scene of his arrest.

Officer Cobbs' body-worn camera video depicts him arriving on scene where Defendant had already been handcuffed. Officer Cobbs searched Defendant while he remained in handcuffs and found money in Defendant's pocket. Officer Cobbs also searched Defendant's shoes for contraband. The footage ends after Officer Cobbs placed Defendant in the back of his marked patrol car. The footage does not show Officer Cobbs providing Defendant his *Miranda* rights. Further, Officer Cobbs testified that he did not provide Defendant with his *Miranda* rights.

iv. <u>The Court's Findings</u>

The Court finds, by a preponderance of the evidence presented at the hearing, that Defendant was properly provided with his *Miranda* rights by Corporal Greb at the time of his arrest and waived those rights prior to answering questions related to the location of his vehicle. Corporal Greb testified credibly that he provided Defendant with his *Miranda* rights and that Defendant waived those rights. Defendant testified that he was provided his *Miranda* rights on the day of his arrest but not by Corporal Greb but from another officer who was transporting him. Officer Cobbs testified credibly, and consistent with body-worn camera footage, that he transported Defendant after his arrest but did not provide him his *Miranda* rights.

17

Because the Government has established by a preponderance of the evidence that Defendant properly received and waived his *Miranda* rights, his statements about the location of his BMW, and the fruits of those statements—the evidence resulting from the search of the vehicle pursuant to a search warrant—will not be suppressed.

Search of Defendant's Vehicle and Home

As it relates to the search of Defendant's vehicle and home, he argues that the vehicle was searched on the day of his arrest, without a warrant.  (*See* ECF No. 36 at PageID. 497.)  With respect to the search of his home, Defendant argues that the "warrant authorizing a search of his home contained the fruits of the non-mirandized statements as well as statements following [his] illegal arrest."  (*Id.* (alteration added).)

   i.   Defendant's Vehicle

Starting with the alleged warrantless search of Defendant's vehicle after his arrest, there is no support for this in the record.  At the evidentiary hearing, the Court heard testimony from Corporal Steven Dluzynski who testified that after Defendant was arrested, he was handed the key fob to the BMW found in Defendant's pocket, and was tasked with locating the vehicle.  (ECF No. 47 at PageID. 787-88.)  Corporal Dluzynski was informed of the vehicle's location.  (*See id* at PageID. 788.)  After receiving the vehicle's location, he, and two other

18

officers, discovered the vehicle in an alleyway, confirmed the vehicle's license plate, and pressed the lock button on the key fob to further confirm that they had located the suspect vehicle. (*See id.* at PageID. 789.) Corporal Dluzynski testified that neither he nor any other officer opened the vehicle's doors or otherwise searched the vehicle. (*See id.*)

Corporal Dluzynski further testified that while no doors were opened, he and the two other officers were able to look through the vehicle's windows and saw, in plain view, a pair of sneakers on the vehicle's floor which were a possible match to the sneakers used in the robbery. (*Id.* at PageID. 789-90.) Corporal Dluzynski testified that after making these observations, the vehicle was towed to the Dearborn Police Station by Roscoe's Towing Company, and the tow truck was followed by an officer named Sergeant Thompson. (*Id.* at PageID. 792.) Officer Cecile later testified that the vehicle was only searched after a search warrant was obtained, not before. (*Id.* at PageID. 821-22.)

The Court, therefore, finds that there was no warrantless search of Defendant's vehicle as the Government has established that officers located the vehicle, looked through its windows, towed it to the police station, and only searched it after a warrant had been obtained.

19

ii.   <u>Defendant's Home</u>

Turning to the search of Defendant's home, "the Fourth Amendment requires . . . [that] the affidavit supporting the search warrant must demonstrate a nexus between the evidence sought and the place to be searched." *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (alteration added) (citing *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc)).   Defendant argues that without the non-mirandized statements from his arrest, the affidavit in support of the search warrant for his home lacks a sufficient nexus between the place to be searched and the contraband to be found.  (*See* ECF No. 36 at PageID. 502-05.)

The Court has already found that Defendant's statements were made after a proper *Miranda* waiver.  However, even if the statements on the day of Defendant's arrest were made in violation of his *Miranda* rights, the affidavit in support of the search warrant for his home was supported by statements made during Defendant's custodial interrogation, for which Defendant does not dispute that he was properly provided, and properly waived, his *Miranda* rights.[2]

The affidavit in support of the search warrant for Defendant's home stated the following:

> On June 17th, 2022, [Officer Cecile] interviewed MUSLEH at the Dearborn Police Department. After waiving his *Miranda* rights, MUSLEH admitted that he robbed the Al-Bushra Market, the Marathon

---

[2] The Court notes that counsel for Defendant referred his June 17, 2022, interview as a "proper interrogation."

gas station, and two other commercial establishments in Detroit. During the interview[,] MUSLEH stated that he lives at 10377 S. Morrow Circle, Dearborn, MI. MUSLEH stated that clothing items worn during the robbery of [the] Al-Bushra Market are at the **SUBJECT PREMISES**.

(ECF No. 36-2 at PageID. 518 (alterations added).)  This confession was provided after a proper *Miranda* waiver and establishes a nexus between the place to be searched—10377 S. Morrow Circle—and the items to be found—clothing items worn during the Al-Bushra Market robbery.  Therefore, the evidence found from Defendant's home was not obtained in violation of the Fourth Amendment's warrant requirement.  As a result, it will not be suppressed.

### Conclusion

For the reasons set forth above, the Court finds that: (1) PCAST recommendations are not law and support the use of latent fingerprint analysis; (2) officers had three pieces of information, two of which independently established probable cause for Defendant's arrest; (3) the eyewitness identifying Defendant as "Black," instead of "Arab," is not an inconsistent identification; (4) Defendant properly waived his *Miranda* rights during his arrest and advised police of the location of his vehicle; (5) Defendant's vehicle was not searched until after a warrant had been obtained; and (6) the affidavit in support of the search warrant of his home established a sufficient nexus between the home and the contraband to be found.

Accordingly,

**IT IS ORDERED** that Defendant's Motions to Suppress (ECF Nos. 35, 36)

are **DENIED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: July 1, 2024